Adams *vs.* Jones.

EXECUTORS OF E. H. ADAMS, plaintiffs in error, *vs.* ADMINISTRATOR OF ELIAB JONES, defendant in error.

When a bill was filed, alleging fraud in the conveyance of land and other property, praying for an account and decree against the defendant:

*Held*, 1. That the allegations in complainants' bill made a case of *fraud*, on the trial of which parol evidence was admissible to prove the fraud, and thereby raise an *implied trust* in favor of Jones and his family.

2. The alleged widow of the intestate, and his son, were competent witnesses for the complainant on the trial of the cause, under the 3798th section of the Code.

3. In the discretion of the Chancellor, compound interest may be charged on a final settlement with an implied trustee, who *fraudulently* obtains possession of the property, as well as against a trustee appointed, who *rightfully* obtains possession of the property, as provided by the 2562d section of the Code; the former comes within the reason of the rule prescribed for the latter.

4. Seven years' absence of Jones, without being heard of, was presumptive evidence of his death, and authorized the Ordinary to grant letters of administration on his estate; and although that presumption might have been rebutted by evidence on the trial, still the letters of administration were conclusive, on the trial of this case, as to that fact, *in the absence of any evidence rebutting that presumption*.

5. In view of the facts contained in this record, the defendant is not protected by the Statute of Limitations, nor by the equitable bar of lapse of time.

6. The Court charged the jury that "when the answer is contradictory in itself, or contradicted by other evidence, the jury are not *bound* to give credit to *any portion* of it:" *Held*, that this charge of the Court was too broad in the latter portion of it; that it should have been left to the jury to determine what credit they would give to the answer, or to any *part thereof*, without any intimation from the Court: they were the exclusive judges as to the credit to be given to the answer of the defendant, in view of the facts contained and stated therein.

Equity. Trust. Wife as witness. Before Judge COLE. Macon Superior Court. September Term, 1867.

On the 16th of June, 1860, Felix A. Johnston, administrator of Eliab Jones, deceased, late of the county of Dooly, in said State, by his bill made the following averments: Said intestate was, in his life-time, possessed of considerable estate, both real and personal, consisting of certain lands, negroes,

stock, growing crops, furniture and farming utensils, of the value of twenty-five thousand dollars, as will more fully appear by copy-deeds and bill of particulars attached, in his own right and title, and was indebted but a small amount, if anything, and no judgments, liens, or mortgages or other incumbrances, or if any, but a small sum, were hanging over his estate.

In July, 1849, it was alleged and charged that Jones was guilty of a crime that would subject him to a great trouble and expense, and perhaps to pains and penalties, if not to the penitentiary. While he was the subject of the terror and fears which the charges made against him produced upon his mind, and was thus wholly disqualified from transacting any business and laboring under great mental anguish and distress and desirous of leaving the State, he applied to several persons for the purpose of procuring necessary funds for doing so, as well as to arrange for the payment of the several amounts of debts he owed, to protect his family from being harrassed, and his property from being attached or levied on after his absence, and while thus situated, he was induced by one Ezekiel H. Adams, of the county of Macon, in said State, under the pretence of great friendship and sympathy for Jones and his family, but with the real intent and desire to defraud him, to make and execute certain deeds and titles to said Adams, to the following lots and parcels of land, as will fully appear by the copy-deeds attached, to wit: Lots Nos. 98, 126 and 127, each lot containing two hundred and two and one-half acres, and ninety-six and one-half acres of lot No. 129, and seventeen nine-tenths acres of lot No. 130, all in the first district of said Dooly county, said lots and fractional lots containing, in the aggregate, seven hundred and twenty-one and nine-tenths acres of valuable and well-improved land, together with the growing crops of cotton, corn, wheat, oats, etc., on said land. Said intestate had purchased of one William W. McLendon, of the county of Dooly, lot of land No. 128, in the first district of Dooly, containing two hundred and two and one-half acres, at and for the price of seven hundred dollars, and held the bond for

titles to said last mentioned lot, and had paid said McLendon one hundred dollars in part of the purchase price, and said intestate was induced at the same time, and under the same mental excitement, and same promises of said Adams, to transfer said bond for titles to said last mentioned lot of land to said Adams, and said McLendon, on the 20th of September, 1849, in accordance with the said bond, and the transfer thereon, made and executed to said Adams, a deed in fee simple to said lot of land. Said intestate, on the said 16th of July, 1849, did also sell and convey to said Ezekiel H. Adams the following negroes, to wit: Ann, a woman, then about nineteen years of age, and her child, of the value of one thousand two hundred dollars, and Meranda, a girl, aged about eighteen years, and of the value of one thousand dollars. The crop of cotton made in the year 1849, on the said land, was of the value of one thousand dollars, the corn crop was of the value of three hundred dollars, there were seventy bushels of wheat, of the value of one hundred dollars, seventy head of sheep, the value of one hundred dollars, seventy head of hogs, of the value of three hundred dollars, secretary, tables and furniture, of the value of three hundred dollars, plantation tools, of the value of fifty dollars, one lot of carpenter's tools, of the value of fifty dollars, two mares, of the value of fifty dollars each, a yoke of oxen and cart, of the value of sixty dollars, sixty head of cattle, of the value of four hundred and eighty dollars, and large amount of notes, accounts and claims against various persons, the amount and parties unknown to complainant, but amounting to two thousand dollars, or other large sum. The value of land, crop and stock, and furniture and negroes, together with the land, was of the aggregate value of sixteen thousand three hundred and thirty dollars, which the said Adams, operating upon the fears and anxieties of said Jones, as well as through false and fraudulent representations, that the said criminal charge did greatly endanger the said Jones, as well as under the false pretence of assisting the family of said Jones, by these false, fraudulent and wicked devices, which said Adams so well knew how to manage, did induce said

Jones, for the inadequate sum of one thousand dollars cash advanced to the said Jones, to convey the right and title to the whole of the property and effects above set forth, to said Adams, under the false and deceptive promise, on the part of said Adams, that if Jones would leave the State, he, Adams, would pay the debts of Jones, amounting to five or six hundred dollars, reimburse himself the amount of one thousand dollars, which he had advanced to Jones, and then sell and dispose of all the property set forth and described in this bill, and pay over the same to Jones and his family.

Said conveyances, sales and transfer of all the above described property, by Jones to Adams, were made without any other consideration than that set forth and described, and for no other purpose than to enable Jones to leave the State, as he was persuaded and urged to do by said Adams.

Adams, better to conceal his purposes, induced and persuaded Jones to remove to his (Adams') house, used every artifice which his tact could suggest, and device which his ingenuity could invent, to exaggerate the crime with which Jones was charged, to magnify the excitement against him, and to increase his fears and excite his apprehensions in every possible way, by keeping Jones concealed from his, the said (Adams') family, by refusing the visits of any of the family of Jones, by calling in legal counsel under the pretence of consulting for the benefit of Jones.

Adams advised and persuaded Jones to make and execute to him absolute and unconditional deeds and bills of sale to all the above property set forth and described under the false and fraudulent pretence that it would enable the said Adams the better to sell and dispose of the said property for the use and benefit of Jones and his family. But for the great confidence reposed by Jones in Adams, and his repeated promises and assurances that he, (Adams,) would sell the property, and after paying the just debts of said Jones, and reimbursing himself the amount advanced to Jones, and the interest thereon, would faithfully, fairly and honestly turn over all assets arising from the sale of said property, of every kind whatsoever, to the said Jones, and but for this promise, on

the part of Adams, and the great and controlling influence Adams exercised over the mind and feelings of Jones at the time, Jones never would have executed the said deeds and bills of sale, nor turned over or delivered to Adams the negroes, stock, furniture, crops and provisions. It never was agreed to or understood by and between Adams and Jones, that said sale and conveyance was made or executed upon any other terms, or for any other purpose than as above set forth.

Jones, in his lifetime did, and since his death, complainant has repeatedly applied to Adams to come to a full and fair settlement, and after deducting his expenses and trouble, the debts of Jones, and the amounts due, which Adams had advanced to Jones, and the interest thereon, to account to and with complainant for the balance of the assets in his, Adams', hands. Adams absolutely refuses to comply with such request, and at times pretends that said sale and conveyance was absolute and unconditional, at other times that he has accounted to and with Jones, pertaining to all the matters and things set forth, at other times that the whole of the assets were absorbed in the payment of the debts of Jones, at other times pretending that Jones is not dead, and that he is ready to account to and with Jones, all matters and things pertaining to said sale and delivery.

There were interrogatories as to each of the foregoing statements with a prayer that each be fully answered, and besides the prayer for *subpœna* and general relief, a prayer that said defendant answer the premises, and that an account may be taken of what is due to said defendant in respect of the loan of one thousand dollars or other sum, and the interest due thereon, and of the debts of Jones paid by Adams, and the interest due thereon, and that upon the payment of the said several sums, said defendant be decreed to account for the annual rents of the land, the hire of the negroes, and the proceeds and value of the personal and perishable property that went into his hands belonging to Jones, to reconvey to complainant the said lands and negroes so bargained and sold by Jones to Adams, or that Adams be decreed to account to and pay over to him the present value of the lands and

negroes, together with the rents of the lands and hire of the negroes, and value of the other property, sold and conveyed by Jones to Adams, after deducting therefrom the amount loaned by Adams to Jones, and the interest thereon, and the debts paid by Adams outstanding against Jones, and the interest thereon, and that Adams be allowed to retain such reasonable compensation as shall seem proper for his expense and trouble in managing said property.

Attached to the bill as exhibits, were a copy of a deed from Jones to Adams for said first mentioned lots, dated the 16th of July, 1849, for the expressed consideration of $2,500 00, and a deed from McLendon to Adams for lot Number 128, dated the 20th of September, 1849, for the expressed consideration of $625 00, both in the usual form, and a statement of the personalty sold by Jones to Adams as follows :

| | |
|---|---:|
| Value of Cotton Crop | $1,000 00 |
| Value of Corn | 200 00 |
| 70 Bushels Wheat | 100 00 |
| 60 Head of Cattle | 480 00 |
| 70 Head of Sheep | 100 00 |
| 70 Head of Hogs | 300 00 |
| Secretary, Tables and Furniture | 300 00 |
| Plantation Tools | 50 00 |
| Lot of Carpenters' Tools | 50 00 |
| 2 Mares | 100 00 |
| Negro Woman, Ann, and child | 1,200 00 |
| Negro Woman, Meranda | 1,000 00 |
| Oxen and Cart | 50 00 |
| | $4,930 00 |

The defendant plead that he had been in the peaceable, quiet, uninterrupted possession of said lands and slaves continuously and adversely since the 16th of July, 1849, controlling them as his own, and complainant was thereby barred. He also at the same time filed his answer, in which was a demurrer to the bill. Subsequently, he filed a separate demurrer on the same grounds, to-wit: because there was no equity therein; because it does not appear therein that Jones

Adams *vs.* Jones.

is dead or, if he be, when he died; because, by its face, complainant is barred by lapse of time; because said conveyances were absolute, and for the considerations therein expressed. No action appears to have been taken on this demurrer.

He answered that he did not know whether Jones was dead, and insisted on proof of the death and its date. He admitted that Eliab Jones, on the 16th of July, 1849, owned such property as was described in the bill, in Dooly county, but said it was not worth $25,000 00, or any such large sum. He said Jones was considerably embarrassed, suits were pending against him, and he could not pay his debts without selling his property. He admitted that Jones was charged with a crime of the troublesome and dangerous character charged, but denied that Jones was thereby disqualified from attending to any business. He admitted that Jones wished to leave the State, and averred that he applied to several persons for funds necessary for that purpose, as well as to pay his debts, protect his property from attachments, and to protect his family in his absence; that Jones voluntarily applied to him twice or thrice to get him to buy his property; that fearing Jones was in debt overwhelmingly he refused at first, but finally, at Jones' solicitation, he absolutely bought said property, for the consideration recited in said deed, etc., which was actually paid; that he paid Jones $100 00 for the crop; that he paid him $100 00 which he had paid McLendon, took the bond, paid $625 00, balance due to McLendon, and took from him said deed. He said he bought Ann, about nineteen years old, and her child, and Melinda, (called Meranda in the bill,) about eighteen or twenty years old, the woman and Ann's child, then worth $1,000 00 or $1,200 00, and paid Jones therefor $1,000 00. He denied that the cotton crop was worth $1,000 00 or the corn crop $300 00, or that there were seventy bushels of wheat, admitted he got seventy sheep worth $70 00, about forty hogs worth $80 00, about forty cattle worth $135 00, furniture worth $50 00, and plantation tools worth $10 00, and a yoke of oxen worth $50 00, and a note for $100 00, and collected it. He denied getting any carpen-

ter's tools except a saw, plane and square, all old, and of but little value. He denied getting the mares, said there was one mare and colt, which Jones' son took. He said he paid Jones for all these things except as stated hereafter; that property was then low, and all of said property was, at the date of the sale, worth not more than $6,000 00 or $7,000 00. He said that Jones was of sound mind and capacity, and the trading was *bona fide* and made without any of the fraudulent practices or purposes charged, and in this wise: Jones urged and solicited Adams to advance to him $1,050 00, a horse and buggy to be taken in part payment of the $1,050, and to pay his, Jones' debts, which he, Jones, then and there represented to be not more than from $3,300 00 to $3,500 00 dollars, and agreed, in case Adams would advance to him the $1,050 00 as aforesaid, and pay $3,300 00 of his debts, to make absolute sale and deed to Adams to the lots and fractional lots of land first mentioned in said bill, and transfer said McLendon's bond to the other lot of land, and deliver to Adams as his own property, the negro woman Ann and her child, and the woman Melinda, and to sell and convey to him his stock of cattle, sheep, hogs, corn, cotton, potatoes, furniture, farming utensils and all fixtures, and secretary, oxen and cart, etc., except as hereinafter excepted; and at the urgent request and solicitation of Jones, he did accept said offer, and advanced to him, Jones, $1,050 00, and did agree to pay not exceeding $3,300 00 of his said debts, and he took a deed to his land first mentioned in said bill, a transfer of McLendon's bond as aforesaid, and afterwards, on the 20th of September, 1849, paid McLendon $625 00, or the balance of the purchase-money as before stated, and obtained a deed to said last mentioned land in the bill, and also took receipts for stock, corn, cotton, furniture, etc.

He said he had actually paid Jones' debts to the amount of $3,413 00, besides advances to Jones' family, and other expenses. He denied urging Jones to leave the State, denied the charges as to concealing him or keeping his family from him, admitting that Jones came to his house, but said that Jones went to and fro at his pleasure for two or three

days before he left.  He denied any promise to pay Jones' family, or Jones, the proceeds of the sale of the property after paying the debts, averring that he bought all absolutely and without any trust or liability to account to any one, except a part of the household and kitchen furniture, which he returned to Jones' family.

He said, Jones had never called on him for an account, admitting that complainant had, before the date of his letters of administration, without stating what he wanted, or what account, or from what source.  He admitted a trust as follows: On the 16th of July, 1849, in addition to from $3,300 to $3,500, just debts which he, Jones, admitted he owed, there was existing against him and one J. A. Shine, as partners, a large mercantile, Charleston, debt, which Jones was afraid would devolve upon him, and in consequence of said debt, Jones agreed to put into the bill of sale along with the said woman Ann, and her child Jane, and the woman Melinda (which were absolutely and unconditionally sold and conveyed), three other negroes, viz.: Eliza, about, then, thirty-five years of age, a boy about twenty years old, named Green, and a girl Harriet, sixteen years of age, then, upon the parol understanding and agreement, that if the said Charleston debt came against Jones, the three last mentioned negroes were to go to pay it off, and if anything was left, the surplus was to go back to Jones or his family.  And under said understanding and agreement, Jones did, on the day and year last aforesaid, execute to Adams, an absolute bill of sale to Ann and Jane, and Melinda, as of his own absolute right and property, and also included in the said absolute bill of sale, said Eliza, and Green, and Harriet, with the parol understanding aforesaid, as to these last three negroes.  And there were a wagon and six mules, and some portions of the household furniture which he received in trust, to account to said Jones and family, and which are not set up in said bill, except as to the portion of furniture which Adams was to keep, and which three negroes, Eliza, Green and Harriet, he returned to said Jones, said Charleston debt never having devolved on Jones for payment, and also re-

turned, pursuant to said trust as to said property, the six mules, wagon, and said portion of household furniture.

He said, the land was worth (when he answered) $10 per acre, and $250 *per annum* for rent; that he had not gotten over $100 worth of timber from it; that Ann was diseased, and died in 1857, leaving three children; that her annual hire was not worth over $30; that Jane, her child, was eleven years old, and worth $600, and her third child was worth $400; that Melinda was a runaway, in chains, when he bought her, and that he soon sold her; she was barren. He said, that when he took possession, the crop was full of grass, etc.; and, while he did not remember the amount or value of the crop of that year, he put the cotton at $150, and the corn at two hundred bushels, worth $100; said, the amounts of other property were too largely stated by the exhibits to the bill. He said, he did not believe Jones was dead; and insisted that the letters of administration granted in Dooly county were void, because Jones was not shown to have died in Dooly county, or to have had *bona notabilia* there.

To this answer was attached an exhibit of said conveyances, and a statement of the debts paid by him for Jones.

He also exhibited copies of notes and accounts against Jones, paid off by him, to-wit:

One note for $316 40½, due 1st January, 1850.

One note for $200 00, due 1st January, 1848. Credited by $100 00, February 11th, 1848.

One note for $1,325 00, due 1st January, 1848. Credited by $400 00, 13th July, 1848, and $600 00, February 10th, 1849.

One note for $500 00, due 25th December, 1848. Credited by $132 50, 10th February, 1849.

One note for $875 00, due 1st January, 1848. Credited by $700, 31st March, 1849.

One note for $70 00, due 13th January, 1849.

One note for $26 83, due 2nd January, 1849.

One note for $95 00, due 25th December, 1849.

One note for $20 65, due 8th February, 1849.

Adams *vs.* Jones.

One note for $8 31, due 8th June, 1848.

One note for $56 08, due 4th May, 1849.

One note for $340 00, due 6th January, 1847.   Credited by $156 00, 5th January, 1847.

One note for $141 70, due 1st January, 1848.

One note for $50 00, due 16th May, 1849.

One note for $15 60, due 9th February, 1849.

One note for $225 00, due 1st January, 1848.

Accounts against Jones, paid off by him, for the following sums: $8 21¼, paid 18th July, 1849; $12 00, not receipted; $28 76, paid 21st August, 1850; $3 62, paid 21st August, 1850; $9 67, paid 25th July, 1849*; $61 08, paid 23rd January, 1851; $40 60, paid 29th July, 1849*; $24 57, paid 25th July, 1849*; and three *fi. fas.* against Jones, one for $26 26, with interest from the 18th of August, 1849, and $1 56¼ costs; another for $6 30, with interest from the last date, and $1 56¼ costs; and the other for $400 00 principal, $24 35 interest to 22d November, 1849, transferred to Adams for $387 00 paid by him.

(*) Each of the foregoing followed by a * appears to have been transferred to Adams by its owner.

He answered, that besides the foregoing, he had paid for Jones something to S. S. Bonn, and something to G. C. Carmichael, he did not remember how much, and $200 00 to McKenzie. He also exhibited three receipts from Jones to Adams, dated the 16th of July, 1849, which were attached as exhibits to the bill, one for $100 00 "for the growing crop of corn, cotton and potatoes," on Jones' farm; one for $300 00 "for seventy-five head of sheep, more or less, fifty head of cattle, more or less;" one for $155 50 "for all my (Jones') household and kitchen furniture, farming utensils and fixtures, on my (Jones') plantation, together with my library of books, wheat-fan and thresher, corn, wheat and fodder that belongs to my (Jones') place, where I now live." Exceptions having been filed to said answer, Adams amended it in 1861, by saying Ann was worth only $400 00, giving the reasons therefor, Jane was worth $600, and her hire for the past year or two about $20 00 *per annum*, Chaney, her second

child, worth $400 00 and no hire, Melinda, worth $600 00, for hire $75 00 *per annum*, he sold her in 1850 or 1851 for $600 00 or $650 00, in part payment of a debt which the purchaser held against Jones; he gave Ann and her three children to his daughter in 1855 or 1856 ; ·he said he could not remember how many bales of cotton were made on the Jones' place in 1849; it may have been only five, and possibly ten, but not more; that a part of the $1050 00 paid by him to Jones was a fine horse and buggy, with which Jones went off, though he had nothing to do with sending him off, he went off voluntarily; he admitted getting another account in favor of Jones for $75 00, but gave it to another party in payment of a debt due that party from Jones; admitted that he got fifteen or twenty bushels of wheat from the crop, but said that Jones' family consumed most of the wheat, and he admitted the sale of one hundred and twenty-five pounds of bacon at twelve and a half cents. He concluded his amended answer by a prayer that Johnson should discover whether Jones was dead when he administered on his estate, and when and where he died. To this he exhibited a bill of sale from Jones to himself, for Eliza, thirty-five years old, Ann, nineteen, Jane, six months, Green, twenty-two, Harriet, sixteen, and Melinda, twenty years old, made the 16th of July, 1849, for the expressed consideration of $2200 00 cash. Adams died, and ·at September term, 1866, his executors were made defendants. During the trial Johnson amended his bill by averring that he did not have, nor did he believe Jones had, any notice prior to November or December, 1859, that Adams held adversely to Jones, and would not account to Jones or his family. Answer to this was waived.

The evidence on the trial was as follows:

MATHENIA JONES, by interrogatories, testified in behalf of the complainant, on the 30th of August, 1867 : That she was the wife of said Eliab Jones at the time of his leaving the said county of Macon, and State of Georgia, and the last time she heard of him was in the year 1849; that Adams came to her house and got her husband's horse and buggy, and said he was getting said horse and buggy to carry off

said Jones; that Adams came to her house on Sunday evening, and said he wanted to have some private talk with her, and thereupon she went into a private room with Adams, and he said that Mr. Jones was in a very excited state of mind, and was going off to stay about a month, or not quite so long, and that he (Jones) wanted his land papers and the bills of sale of his negroes, and she said that she (witness) did not want to give them to him, for that he (Jones) was deranged, or was so the last time she saw him; Adams assured her that he (Adams) would return them to her again; thereupon she gave the papers to him, (Adams,) and Adams came to her house on Monday night, the next night afterwards, and told her to have two suits of clothes ready by the next night, that Jones (her husband) was going off, and that he (Adams) would bring him to see her, and on the next night Adams came and got the clothes, but did not bring her husband, nor did bring the papers, and took her husband's horse and buggy and the two suits of clothes, and carried them off in the night, and the next morning he (Adams) came down and told her that her husband was gone, and he (Adams) then called up all the negroes on the place, and told them that he was their master, and said that every thing on the place belonged to him—lands, negroes, horses, and everything else, and said to her that if she would turn over everything to him, he would hold possession until he paid off the debts, and would then turn over the balance to her, and told her that he had Jones in his house, locked up in a closet, until he (Adams) sent him off from the State; Adams took possession of five negroes, two horses, and six mules, and the store-house, and with the goods in the store-house he settled the debt in Charleston against her husband; he (Adams) took seventy-five or eighty head of hogs, seventy-five head of sheep, forty or fifty head of cattle, one wagon and one horse cart, one large chest of carpenter's tools, forty head of geese, forty bushels of old corn, one thousand or fifteen hundred pounds of bacon, thirty-six bushels of wheat, about three hundred dollars' worth of furniture, a fine crop, in good condition; twelve hundred bushels of corn were made

that year, and about nineteen bales of cotton, about eight thousand pounds of fodder; she did not remember about the peas and potatoes; the whole crop was worth about three thousand dollars, that went into the possession of Adams in 1849; that D. B. Jones worked on the place that year for one-eighth part of the crop, and his part of the corn was one hundred and fifty-three bushels and three pecks of corn; his cotton came to one hundred and twenty-six dollars and some odd cents; that H. D. Powell did not get any negroes from Adams.

That Jones, at the time of his leaving, owed Clark & Scott, she thinks, about $500 00, as part payment to them for negroes, which he purchased for $800 00, which was afterwards paid by Adams with a negro woman belonging to said Jones. The name of said negro was Melinda. He also owed sixty-five dollars to William Jones for a yoke of steers, which were afterwards also sold by Adams, who paid that debt. He also owed Henry Powell sixty-five dollars, which was afterwards paid by said Adams with a mare belonging to said Jones. That Adams, shortly after Jones left, proposed to her that if she would turn over all the property Jones owned to him, (Adams,) he would pay all the debts owed by Jones, and whatever might be left he, (Adams,) would return to her. The property was accordingly turned over to Adams by her. Adams afterwards stated to her that he had paid all of Jones' debts with Jones' own property. Shortly after this Adams proposed to her, that if she would remove to Alabama, he (Adams,) would buy her a tract of land in Alabama, in consideration of the property owned at that time by Jones, and in possession of Adams; that Adams came to her house and got Jones' horse and buggy, saying that he was getting said horse and buggy to carry off Jones. That over $6,000 00 worth of personal property went into the possession of Adams, besides the real estate; that Adams unlocked the secretary, and took some money; she did not know how much; that Henry Powell got one of the mares left on the place; she did not remember who got the other; that Adams got the proceeds of the wagon and mules, and

that her husband was getting $800 00 a year for the wagon and mules. Adams took some papers—she did not remember the exact nature of the papers. Adams took Jones' clothes to him from his, (Jones',) house.

Cross-examined, she said: I live in Bibb county, State of Alabama. I am interested as an heir of my husband, having assigned my dower interest, and taken a child's part. I expect to gain by the result of this suit. The complainant is my son-in-law. Eliab Jones is my husband, if he is living. I do not know whether or not he is living. I do not know where he went. We were living together at the time he left. I have never heard of him since his departure. In my answer to direct interrogatories, I have said nothing from rumor. I have stated facts that came to my own knowledge, and those which said Adams, himself, told me. I have stated, as nearly as I am able, after the lapse of time, the language used by said Adams in our different interviews. There was no one present at these interviews except himself and myself. I know of no trades between the said Adams and Jones, or any other person. Adams took possession of said property, as declared in direct interrogatories, stating that Jones would be gone only a month. I knew of no sale of property by Jones to Adams, and never heard of any. Jones was not much in debt when he left. Adams paid, (as he told me,) the debts of Jones with his (Jones') own property.

I knew of no understanding or agreement between Jones and Adams about paying debts. I have stated nothing from rumor in regard to crops, as to quantity or value. I have stated facts which came to my own knowledge about them. I know nothing of any agreement between Jones and Adams in regard to the payment of Jones' debts, except that which I have already stated. I knew of nothing in regard to Jones' leaving any money with Adams to pay these debts. Adams took some money, as already stated, from my secretary, but I do not know how much, or whether he was authorized or not by Jones to do so. I do not know whether or not Adams paid Jones' debts. He told me that he had paid the debts.

I have stated all the words of said Adams, as nearly as I can remember, that he uttered in our interviews. I received from Adams three negroes, a man named Green, about thirty years old, a woman named Eliza, about thirty-five years old, and a negro girl named Harriet, about fourteen years old, and a wagon and six mules. I received, also, from Adams twenty dollars, to bear my expenses to Alabama. He said that he would meet me before I got to said State, and give me more, but I never afterwards saw him. I do not know of Adams having paid Jones any money whatever before said Jones left.

LEVI JONES, in behalf of complainant, testified by interrogatories as follows, on the 23d of May, 1861: I was acquainted with Eliab Jones. My only acquaintance with him was in Macon county, Alabama. The last I saw of him was in the summer of 1849, in Macon county, Alabama. I can say that he did not act as a rational man when I saw him. He took a vial of laudanum at my own house, which he acknowledged he took to kill himself with, and would set for hours under a shade tree in my yard, looking up the wagon road, with a knife in his hand, and said he would kill himself if any one came after him. He came to my house in July or August, 1849, and left the last of August or first of September, 1849. I have never heard of him since he left. The only property that I knew him to have at my house in Alabama was a horse and buggy, and the negro boy Reuben. It was a deep bay horse, and I think he had him at my house in the winter; he was in possession of Eliab Jones. He sold me the horse and buggy for one hundred and eighty dollars, and he sold the boy Reuben for five hundred and fifty dollars, to get money to go away upon.

Cross-examined, he said: I live in Macon county, Alabama, at the same place where Eliab Jones was, at my house. I am not related to Eliab Jones in any way. I am no physician. I have stated nothing but facts of my own knowledge. I don't know if Eliab Jones is now living or dead. As I have stated, the first and last time I ever saw him was

Adams *vs.* Jones.

at my house. The last I knew of his living was the day he left my house. I have no interest in the suit.

D. B. JONES, sworn by the complainant, testified: That he lived with his father, Eliab Jones, the year he went away or left Georgia, in 1849; that he was to have a certain portion of the crop for his services—the eighth—that he got one hundred and fifty bushels of corn, and a stack of fodder, and that his part of the cotton crop was worth one hundred and twenty-six dollars and some cents; that he sold his part of the cotton to Ezekiel H. Adams for the above sum, in the presence of Nathan M. Massey, and he sold the fodder to said Adams for eight dollars. Adams told him that the property was left with him (Adams) by witness' father, to pay his (Jones) debts and to turn over the balance of it to his father's family after the debts were paid; that his father was confined at Adams' house for several days before he went away, and that Adams promised him he should see him before he left. Adams told him and his mother that he would bring him to see them; but he did not do it. Afterwards, when Adams came for Jones' clothes and things, witness reminded him of his promise, but he put him off. Witness tried to get him to carry a letter to his father, which he declined. Adams told witness' mother that, if she would go to Alabama, he would go to Alabama and purchase for her a better plantation than Jones had turned over to him. When Jones' family left Georgia in December, 1849, Adams turned over to them three negroes, to-wit: Green, Eliza and Harriet, the wagon and six mules, and some household furniture. There were on the plantation, when Jones left it, some five or six hundred bushels of corn, and a considerable quantity of fodder. The crop had been well cultivated, and Adams took some of the hands off, and worked them on his own farm; there was plenty of bacon on the place to supply the farm.

Cross-examined. Witness' mother was present when Adams spoke about the arrangement that was made between Jones and himself in reference to the property. Adams was talking to Mrs. Jones about it. Witness is quite deaf now, and was very deaf then, but he heard what was said. Never saw

his father or heard of him after he left the State. Is the son of Eliab Jones, and has not released his interest in the estate; he expects to get his portion of any recovery that may be had in this case. Resides in Alabama. Eliab Jones' family previous to their departure, lived upon the provisions on the place.

WILLIAM W. McLENDON, in behalf of complainant, testified: That he sold Jones one of the lots of land purchased of him (Jones) by Adams, for six hundred or seven hundred dollars, and gave Jones his bond for titles of the same. Previous to his departure, Jones paid one hundred dollars of the purchase money. After he left, the bond was in Adams' hands, who paid him the balance of the purchase money, and he made a deed to the land to Adams. Witness made some one or two hundred dollars on the land trade with Jones, including some hogs sold with the land to Jones. Just before or just after Jones went away, he is under the impression that lands rose greatly in value; if this rise took place before Jones left, (of which he is doubtful,) the settlement of land conveyed to Adams was worth eight or nine dollars per acre. If lands advanced subsequently, it was not then worth more than three or four dollars per acre. The notes exhibited in the exhibit to defendant's answer, payable to witness, and signed by Eliab Jones, were the only claim held by witness against Jones at the time he left, and they were paid by Adams. There was considerable excitement existing and manifested against Jones by the people at the time he left, in consequence of criminal charges against him.

BENJAMIN A. HUDSON, in behalf of complainant, testified: That he bought some bacon hams at the Jones' place, from Adams, in 1849. Don't recollect the quantity or price; thinks the land was worth, at the time of the sale from Jones to Adams, from eight to ten dollars per acre. Adams told witness he had a good crop on the place.

WILLIAM H. ROBINSON testified: That he was sent for by Adams to go to his house, in 1849, to see Jones; supposed, when he went, that Jones had sent for him to defend him in a criminal charge alleged against him. When he

reached Adams' house, he found Jones in the up-stairs of Adams' house. Jones said nothing to him about the criminal charge; both asked him about conveyances of property; they (Jones and Adams) would retire to the horse lot and other places about the premises, and have long private interviews, and then return and consult him again. Sometimes Adams went by Jones' invitation, but as frequently Jones went by Adams'. Witness drew no conveyances set forth in defendant's answer, and does not know what the parties were conversing about.

Cross-examined, he said: that it was in the day-time, and witness is counsel in the case for a conditional fee.

Complainant then introduced the letters of administration to him on Jones' estate, which letters are dated the 6th of February, 1860, and the following letter, written by Ezekiel H. Adams to D. B. Jones:

April 9th, 1850.

D. B. Jones—*Dear Sir:* I received your letter, and was glad to hear you landed safe, but sorry to hear your mother was yet in distress. Say to your mother that it will be out of my power to come out to see her before fall, as I have to attend several of the Spring Courts in this State; but say to your mother that she need not be uneasy about her business; as soon as I can leave I will arrange it for her, or if you and your mother will come in before the fall, I will do what I promised; if you and her can't come before the fall, I will fix it for her then, all I promised. I yet remain her friend, and have not forgotten her because she is with her friends. Tell William that if he can't make money with the wagon, he had better come back. Give them all my respects. Please write to me occasionally. I shall be glad to hear from you all. Write whether your mother expects to stay where she is or not. I promised the old lady, when I went to Louisiana, that I would go by her, and help her pick out a place, but I got clear of going, and did not come out, and thought that her brothers would do better in the matter than I could, as they were better acquainted with the country than I was,

but I yet remain her friend. Please write whether you have heard anything of your father or not, and what has become of James Hogin's family. Write soon, etc.

I remain yours, respectfully,

E. H. ADAMS.

Here complainant closed his case.

Defendants then tendered and read in evidence said exhibits to his answer.

G. CARMICHAEL testified: that he held an account against Eliab Jones for some ten dollars, the precise amount of which he does not now recollect, which was paid him by Adams the year Jones left.

SUMMERLIN testified: that Eliab Jones was indebted to him for lumber, some seventeen or eighteen dollars, which was paid to him shortly after Jones left, by Adams.

NATHAN M. MASSEY testified: that he purchased the fodder from D. B. Jones, and paid him eight dollars, the price he (Jones) said he received from Adams for the same. Witness was as certain as that he then stood in the presence of the Court, that he never saw Adams pay (witness) D. B. Jones any amount of money whatever for cotton, or any other thing, at the time mentioned by said Jones, or at any other time. Witness (Massey) cultivated the Jones' place in copartnership with Adams in 1850, and when he took possession, which was early in that year, the 14th day of January, he found only some four or five hundred bushels of corn on the place, and thinks there were some eight or ten bales of cotton made there the previous year, and this he concludes from the quantity of cotton seed found there and used by him on the place in 1850. Witness is son-in-law and executor of Adams.

JOHN D. ADAMS testified: that Ezekiel H. Adams did not receive the proceeds of the wagon and team left by Eliab Jones; that the same were under the management of William Jones, a son of Eliab Jones, who received the amount due for hauling, and to witness' knowledge, spent a large portion of it. Witness was present when Eliab Jones' family, about

Christmas, 1849, left this State for Alabama. Ezekiel H. Adams turned over to Mrs. Jones, (the wife of said Eliab Jones,) three negroes, (the same mentioned in her interrogatories,) the wagon and six mules, and as much household and kitchen furniture as could be piled on the wagon, and gave her one hundred dollars in money. She commenced crying, and asked Ezekiel H. Adams if that was all he was going to let her have to carry her clear to Alabama, when he replied that she had gotten all the property to which her husband was entitled, and he had given her, as a present, the one hundred dollars, that he did not owe her anything. The crop of 1849, on the Jones' place, was badly cultivated, and after Adams came into possession of it, he had to work it out with his own hands. It was overrun with grass and weeds and water melon vines. There were not more than eight light bales of cotton made on the place, and some four or five hundred bushels of corn, with some small amount of fodder, not exceeding sixty or seventy dollars worth. Jones' family, until they left, lived on and were supported off of the place.

Cross-examined, he said: he was fourteen or fifteen years of age at the time Jones left; was never present at any of the interviews between Jones and Adams. Jones was not confined while he staid at Adams'; came and went as he pleased, as far as he knew. His son, William Jones, during that time, was frequently with him. He acted like a man, who had been guilty or accused of some great crime. Does not think he was deranged. William Jones was present when his father left Adams' house the last time. Witness is son, and one of the executors of Adams.

Jonas Rackley testified: that he lived in the neighborhood at the time Jones left; was well acquainted with the lands sold to Adams by Jones, and thinks they were worth, in 1849, three or four dollars per acre. Saw Jones just before he was charged with the robbery, for which charge he left the State. Does not think that he was irrational, or his mind affected in the least degree.

Littleton E. Moreland testified: that he was well acquainted with the said lands, and that in 1849 they were

not worth more than three or four dollars per acre. He bought lands the same year adjoining those lands, at three dollars per acre, and he thought his was the best land.

JOHN CAUSEY testified: that the land was worth, in 1849, from four to five dollars per acre, saying he resided there in the neighborhood for a number of years, and had bought some land there equally good for about the same price, in the year 1849, in the fall of that year; that he saw Jones about the time the charge was brought against him, and considered him of sound mind.

Defendants read in evidence answers to certain interrogatories propounded to William Souden, in September, 1867, who testified, that he knew defendants, but not the plaintiff; that he lived from the year 1841 to the year 1852 in Macon county, on the lands of Ezekiel H. Adams; knows that some time during the year 1849, Ezekiel H. Adams bought of Eliab Jones his plantation, negroes, wagon and team, and household and kitchen furniture; the terms of the trade were, that Adams was to pay all of Jones' outstanding debts, and the balance to pay Jones in cash. Only knows that Jones told witness the day before he left the country, that Adams had paid him; does not know how he paid him, only as above stated; knows that Jones was considerably in debt, and left the county of Dooly soon after the sale of his property to Adams. Knows that Ezekiel H. Adams paid many of Jones' debts, and perhaps all. There was a wagon and team which deponent understood to have been bought by Adams, which was taken into his possession. Jones' family left Dooly county soon after Jones himself did. They went off, carried by the wagon and team above alluded to, which wagon and team were never returned to Adams in witness' knowledge. Recollects there were a mare and colt, but don't know what disposition was made of them. As far as witness knows, Jones' mind was as good as it ever had been.

To cross interrogatories he answered, that he understood that the trade was reduced to writing. The consideration or amount paid for the property he did not recollect. Did not

Adams *vs.* Jones.

know what was expressed in the writing. Jones told him that Adams had paid him. Did not know the amount. Understood a portion was paid in taking up Jones' debts, the balance in money. Did not know who was present at the making of the trade, nor the witnesses to the writing—was not a witness himself. He supposed the land was worth about five dollars per acre. Did not recollect the number of negroes sold, or their value, nor the amount of the other property included in the trade. He saw Jones at Adams' house for several days previous to his leaving; he did not appear to be attempting to conceal himself, or be concealed by Adams. Did not know when or how he left. Understood he drove off his own horse to Adams' buggy. Knew nothing of Adams exciting Jones' fears. Did not know the exact date of making said trade. It was made some time during the year 1849. Knew none of the circumstances under which it was made. Jones' son drove the wagon and team previous to its sale to Adams. Did not recollect to have seen him drive it afterwards, nor did he know that it was run at all after the trade until Jones' family moved. Knew that Adams paid some of Jones' debts. Did not know that he shaved any of them, or had any transferred to himself.

Defendants tendered and read in evidence the interrogatories and answers thereto of ANSEL HAGINS, who testified, in September, 1867, that he knew the parties; was acquainted with Ezekiel H. Adams, and had seen Eliab Jones; that he lived with Adams (Ezekiel H.) in 1849. The crops on the Jones place that year were sorry, not more than eight or nine bales of cotton, and four hundred and fifty bushels of corn were made. He (witness) gathered said crops with Adams' negroes. Adams' hands worked on the Jones place in 1849. They plowed and hoed the cotton one time and gathered the crop. The trade took place between Jones and Adams in June or July, 1849, and Jones left about the time it was made. Does not know when Jones' family left, or what property they carried off with them, or what became of the wagon and team. There was a mare and colt on the Jones

place, claimed by Ben. Jones. Adams said she belonged to Ben. Jones. Does not know what became of them. He managed and superintended it after the sale to Adams; gathered the crop with Adams' hands; crop badly cultivated. Jones' family lived on the place, and used the provisions that were there. Knows nothing of any written conveyance. Does not know where Jones stayed. Adams told witness that he had bought the place and gave Jones five thousand dollars for it. Does not know whose horse and buggy Jones went off with; but one mare and colt left on the Jones place, and does not know what became of them. A negro man by the name of Green, and two negro women, worked at Adams' home place a week. Does not know the value of the property turned over by Jones to Adams.

That part of the evidence of John D. Adams stating, that William Jones was at Adams' house when Eliab Jones was there, was disputed by complainant's solicitors, and it was left for the Judge to decide whether that witness so testified; he did not strike it from the brief, but seems to have made no decision on the subject.

For the request to charge, the charges given and the refusals to charge, see the motion for a new trial.

The jury found for the plaintiff $8,621 64-100 as principal, with interest, specifying no time for the interest to begin, and judgment was so entered.

Adams' counsel moved for a new trial, upon the following grounds:

1st. Because said verdict is contrary to evidence, and the principles of justice and equity.

2d. Because said verdict is decidedly and strongly against the weight of evidence.

3d. Because said verdict is without evidence to support it.

4th. Because the Court erred in admitting the evidence of the wife and the son of Eliab Jones, and in overruling defendant's objection thereto, viz: that the said witnesses, although not nominal parties in said cause, were the real parties thereto—would be directly benefitted by the result of

the suit, and had not released, or proposed to release, their interest therein.

5th. Because the Court erred in admitting all those portions of their testimony relating to conversations between them and defendant's testator, and which tended to engraft a parol trust upon written instruments, and in overruling defendant's objections thereto, viz: that said conversations were not set forth or alluded to in the pleadings, and were inadmissible for the purpose of establishing the trust set up.

6th. Because the Court erred in charging the jury, at the request of complainant's solicitors, that if they believed Adams actually, and in good faith, purchased the property which he claims under the deeds, bills of sale and receipts given by Jones, and that the consideration expressed therein was the true consideration he was to pay for the purchase of said property, they must find the difference between that amount and the amount Adams shows he did pay for complainant's intestate with the interest from the time of the sale.

7th. Because the Court erred in charging the jury, at the request of complainant's solicitors, that if they believed from the evidence that the sale and conveyance of the property by Jones to Adams was in trust, for the payment of Jones' debts and then to deliver to his family, they must find for complainant the value of the whole property, deducting therefrom whatever amount Adams may have paid on account of Jones' liabilities.

8th. Because the Court erred in charging the jury, at the request of complainant's solicitors, that they are authorized to consider the facts and circumstances attending this sale— the condition of the parties—the object for selling his (Jones') entire estate—the charges which were alleged against Jones, the fact that he left the State and has never been heard of since, as well as the inadequacy of price, to imply fraud on the part of Adams, or infer a trust as to the sale of this property.

9th. Because the Court erred in charging the jury, at the request of complainant's solicitors, that when the answer is contradictory in itself, or is contradicted by other evidence, the jury are not bound to give credit to any portion of it.

10th. Because the Court erred in charging the jury, at the request of complainant's solicitors, that if they believed from the evidence that the conveyance by Jones to Adams was fraudulent on the part of Adams, then he held the property as trustee for Jones, and after the payment of the debts, he is responsible to Jones for the balance of the value of the property, with interest.

11th. Because the Court erred in charging the jury, at the request of complainant's solicitors, that if they believed from the evidence that Adams had the confidence of Jones to any extent, so as to give him any influence and control over his mind or feelings, and that Jones was staying at Adams' house and his family not permitted to see him, and thus situated, bought Jones' entire estate for a sum or price so grossly inadequate that no prudent man, regarding the interest of his family, would have made the same, they will be justified in finding the sale fraudulent and void, and either decreeing a reconveying of the whole property now in possession of defendants, with the value of the rents and hire of the negroes, or finding for the complainant the value of the property at the day of sale, and interest thereon, for the first six years, at seven per cent., and then compounded annually at six per cent., after allowing Adams credit for whatever amount of Jones' debts he may have paid.

12th. Because the Court erred in refusing to charge the jury, at the request of defendant's solicitors, that if Jones conveyed to Adams absolutely the property in controversy, and a trust was stipulated between them at the time, then this was an express trust, and not an implied trust, and to be valid should have been in writing.

13th. Because the Court erred in refusing, at the request of defendant's solicitors, to charge the jury, that a trust should not be set up, from the evidence of admissions on confessions alone, especially where they are not set out in the pleadings, and the attention of the defendant called to them, an opportunity afforded to him to answer and explain them, and after a lapse of twenty years or more, from the occurrence of the conversations to which the witnesses testify.

Adams *vs.* Jones.

14th. Because the Court erred in refusing to charge the jury, at the request of defendant's solicitors, that the presumption of death, arising from the absence of the party, without being heard of for seven years, is not conclusive—is liable to be rebutted by proof—is exclusively a question for the jury, to be decided by the ordinary test of human experience; and in charging the jury in lieu thereof, that they need not consider this question, as the letters of administration upon the estate of complainant's intestate were conclusive of the question of his death, and could not be attacked collaterally.

15th. Because the Court erred in refusing, at the request of defendant's solicitors, to charge the jury, that while letters of administration afford presumptive evidence of the death of the party upon whose estate they are granted, yet neither they, nor the absence of the party for some years unheard of, will afford any presumption of the death of the party, or whether he died at the beginning, or at the end, or at any other particular period during the seven years—and if it be important to the complainant to establish the precise time of the death of Eliab Jones, he must do so by evidence, to be laid before the jury, besides the presumption of the mere lapse of seven years since the said Eliab Jones was last heard from.

16th. Because the Court erred in refusing to charge the jury, as requested by defendant's solicitors, that in view of the plea of the statute of limitations and lapse of time set up in this case, it is important to establish the precise time of the death of said Eliab Jones.

17th. Because the Court erred, after charging the jury, "that the answer, when it is upon the knowledge of the defendant and is responsive to the allegations in the bill, and the interrogatories founded thereon, is evidence for the defendants, unless overcome by two witnesses, or one witness, and corroborating circumstances," in refusing to charge, as requested by defendant's solicitors, " and that it cannot be overcome by evidence alone of contradictory statements made elsewhere by the defendant, even though such statements may

be proved by a number of witnesses, and especially where such statements are testified to after a long lapse of time, and are not set out or alluded to in the pleadings, and the defendant has had no opportunity of answering or explaining them."

The Judge took time to consider, and in April, 1869, refused a new trial, saying that he thought he had not erred in his charge to the jury, that the evidence fully sustained the verdict, and he thought a new trial would result in the same, or a larger verdict, for the complainant.

This refusal of a new trial is assigned as erroneous upon each ground taken in the motion for a new trial.

S. Hall, B. Hill, George W. Fish, for plaintiff in error, as to the facts not alleged but proved by Eliab Jones' wife and son, as witnesses, cited Boone vs. Chiles, 10 Peters, 209; 2 Dan. Ch. Pl. and Pr., 992; Maury adm'r vs. Mason adm'r, 8 Porter's (Ala.) R., 216, and cases cited; Knight et al. vs. Knight, 4 Madd. R., 10; 2 Dan. Ch. Pl. and Pr., 993, et seq.; 1 Dan., 377; Hale vs. Maltby, 6 Price, 240, 259; Montesque vs. Sandys, 18 Ves., 302; 2 Dan. Ch. Pr., 814; Miller vs. Cotton, 5 Ga. R., 341; 2 Dan. Ch. Pr., 995; Smith vs. Burnham, 2 Summer's R., 612; Com. on Eq. Pl., secs. 263, 265a; as to the value of admissions, Code, sec. 3715; Miller vs. Cotton, 5 Ga. R., 349, 347, 357; the alleged trust was express, and not a resulting trust, Code, secs. 2290, 2291, 2297, 2298, 3732, and Miller vs. Cotton, supra; as to the competency of Eliab Jones' wife and son, Code, sec. 3768, Act of 16th December, 1866, Gleaton vs. Gleaton, 37 Ga. R., 650, Leaptrot vs. Robinson, Ib., 586, Moore vs. Harlan and Hollingsworth, Ib., 623, Archer vs. Greer, 36 Ga. R., 107, Doe ex dem. Crenshaw vs. Robinson ex'or et al., 37 Ga. R., 118, Starkie on Ev. (by Sharswood), 138 et seq., 513, note X.; the charge as to contradictions in the answer was erroneous, Code, sec. 3068, 10 Ga. R., 115, Webb vs. Robinson, 14 Ga. R., 222, 2 Dan. Ch. Pr., 983, et seq., Only vs. Walker, 3 Ark. R., 407, Biddulph vs. St. John, 2 Sch. and Lef., 532, U. S. vs. Wood, 14 Peters' R., 430, Stertevant vs. Waterbury, 1 Edw. C. R., 443; neither

Adams *vs.* Jones.

letters of administration, nor absence for seven years unheard from, is conclusive of death, Code, sec. 3496, Starkie on Ev. (Sharswood), 317, 320, 323, 325, 331, 337, 340, 1 Williams on Ex'ors, 461, 3 T. R., 130, Hubback on Ev. of Succession, 158—165 (37 L. Library, 3d Series), Ib., 159, Sorrell vs. Ham, 9 Ga. R., 55, Harper vs. Smith, Ib., 461; the presumption of death from absence is one of fact as well as law, and the jury should pass upon it connected with all the circumstances, Code, secs. 3675—3677, Best on Pr., secs. 139, 140, pp. 190, 191, Hubback on Succession, 167—181; as to lapse of time, Teller's lessee vs. Eckhart, ex'or, 4 Howard's R., 289, Scott, adm'r, vs. Haddock, 11 Ga. R., 258; absence authorizes no presumption as to date of death, and the date, if material, must be proved, Best on Pr., 191, 192, Powell on Ev., 51, Hubback on Suc., 185, 186, Doe ex dem. Knight vs. Nepean, 5 B. and Ad., 86 (27 Eng. C. L., 45), Nepean vs. Doe, 2 M. and W., 910, S. C., 2 Smith's L. Cas., 307, Doe ex dem. Coffar vs. Flannigan, 1 Kelly (Ga. R.) 543; the party should show diligence in learning about the death, Nepean vs. Doe, 2 M. and W., 913, Stearns vs. Page, 7 How. R., 829, Act of 1767 (Cobb's N. D., 560), repealed sec. 2, Act, 18th Dec., 1817, Ib., 568, sec. 19, Act, 6th March, 1856, Pamph. 1865—6, 235, Code, sec. 2867; the charge was vague and uncertain, 7 Ga. R., 396, 428, 15th, 277, 17th, 444, Ib., 497, 27th, 444, 11th, 286, 16th, 38, 18th, 697, 19th, 285; and the charge made a case of actual fraud, and was not applicable to the facts, 27 Ga. R., 444, Eyre vs. Potter, 15 How. R., 42.

W. H. Robinson, P. Cook, James Jackson, L. E. Bleckley, *contra,* on the three first points, cited 14 Ga. R., 41, 11th, 200, 14th, 286, 16th, 203, 19th, 503, 20th, 50, 411, 27th, 402, 28th, 320, 484, 29th, 547, 365, 628, 36th, 246, 380, 37th, 497, Code, sec. 3641; as to competency of Jones' wife and son, Code, sec. 3798, 37 Ga. R., 118; as to admitting Adams' sayings, not charged in the bill, Adams' Eq. Mag., p. 305, Story's Eq. Pl. Mag., p. 265, Smith vs. Burnham, 2 Summer, 612, Jenkins vs. Eldridge, 3 Story's R., 183; as

to their engrafting a trust on absolute deeds, Code, secs. 2648, 2656, 2291, 2290, 2283; as to the eighth ground, Code, secs. 3751, 2283, 2291, 3116; as to the ninth ground, 16 Ga. R., 416, 26th, 344, 24th, 506; as to the tenth and eleventh grounds, Code, secs. 2709, 3116, 3119—3123 inclusive; as to the twelfth, Code, secs. 2291, 2290, 2283, 6 Ga. R., 589; as to the fourteenth, Code, secs. 3700, 3535, 1 Kelly (Ga. R.), 538, 3d, 260. There being no evidence to rebut the presumption, the charge requested, was properly refused, 15 Ga. R., 205, 22d, 237, 26th, 171, 30th, 560, 891; the same, and Code, sec. 3701; 1st Kelly (Ga. Rep.), 543, as to the fifteenth and sixteenth grounds; this trust can be made by parol, 2d Kelly (Ga. Rep.), 299, 10 Ga. R., 534, 13th, 88, 192, 14th, 207, 15th, 175, 6th, 589, 26th, 631, Code, secs. 2290, 2291; if the trust is express, the lapse of time is immaterial, 7 Ga. R., 157, 8th, 101, 11th, 197, as to lapse of time, 7 Ga. R., 157, 7 John Ch. R., 111, 20 Johnson R., 576, 583, Code, sec. 3140, 8 Ga. R., 487; time can not run in a case of fraud till the fraud is discovered, 7 Ga. R., 161, 20 John R., 583-4, 8 Ga. R., 1, 4th, 308, 10th, 297, 8th, 68, 511, Code, secs. 2880, 2871, 7 Ga. R., 154, 9th, 328, 11th, 195, 258, 13th, 21, 25th, 76, 24th, 558.

WARNER, J.

This was a bill filed by the administrator of Jones against Adams, alleging that in July, 1849, Jones had committed an offence against the laws of the State, which would have subjected him to punishment in the penitentiary, and being anxious to leave the State, went to the house of Adams, and while there, Adams taking advantage of his situation, *fraudulently* obtained from Jones an absolute title to all of his property, including land and personal property, promising Jones that he would pay off his debts, and after retaining the sum of $1,050 00 advanced to Jones, to enable him to get out of the State, that he would pay over the balance to Jones or his family. Such is substantially the case made by the complainant. The bill prayed for an account and decree

Adams *vs.* Jones.

against Adams. The answer of the defendant denied the fraud charged in the complainant's bill, and claimed an absolute title to the property conveyed by Jones to Adams by the written deeds executed, and delivered by Jones to him, discharged of any trust expressed or implied. It further appeared from the record that Jones had not been heard of after leaving the State, for more than seven years, and that administration had been granted on his estate to the complainant by the Ordinary of Dooly county, in which the land and other property was located at the time of making the title deeds therefor, by Jones to Adams.

1. There were several questions raised and discussed on the argument of this case, but we shall confine our judgment to the points made, which must control it. In our judgment, the allegations in the complainant's bill made a case of *fraud* on the trial of which parol evidence was admissible to prove the fraud, and thereby raise an *implied* trust in favor of Jones and his family. Revised Code, sections 2290, 2291, 3121, 2648.

2. The son of Jones and his alleged widow, Mrs. Jones, were competent witnesses for the complainant on the trial of the cause under the provisions of the 3798 section of the Revised Code.

3. On the trial of an equity cause in the discretion of the Chancellor, compound interest may be charged on a final settlement with an implied trustee, who *fraudulently* obtains possession of the property as well as against a trustee appointed, who *rightfully* obtains possession of trust property as provided by the 2562 section of the Code; the *former* comes within the reason of the rule prescribed for the *latter*.

4. The seven years absence of Jones, without being heard of, was presumptive evidence of his death, and authorized the Ordinary of Dooly county to grant letters of administration on his estate; and although that presumption might have been rebutted on the trial, still the letters of administration were conclusive on the trial of this case as to that fact, in *the absence of any evidence* rebutting that presumption.

5. In view of the facts of this case as contained in the

Adams *vs.* Jones.

record, the defendant is not protected by the statute of limitations, nor by the equitable bar of lapse of time.

6. The Court below charged the jury, that " when the answer is contradictory in itself, or contradicted by other evidence, the jury are not *bound* to give credit to *any portion of it.*" In our judgment this charge was too broad, in the latter portion of it, especially. The Court should have left it to the jury to determine what credit they would give to the answer, or to any part thereof, without any intimation from the Court; they were the exclusive judges as to the *credit* to be given to the answer of the defendant in view of the facts contained and stated therein. In my judgment, however, a new trial ought not to be granted in this case for this error in the charge of the Court to the jury. Although the verdict may have been somewhat too large under the evidence, still, I should not myself be disposed to disturb it under the previous rulings of this Court upon that question; yet as the majority of the Court are of the opinion the judgment of the Court below should be reversed, unless the complainant shall write off from the verdict the sum of $3,621 61, leaving the verdict to stand for $5,000 00, I concur in the judgment of the Court to that 'effect.

Let the judgment of the Court be entered reversing the judgment of the Court below upon the terms stated.